Good morning, Your Honor. Justices Teshima, Justice Fletcher, Justice Berzon, Ms. Cushman, my name is Georgia McMillan. I represent the defendant-appellant Jerome Vierra. This case concerns one issue, and that is whether the district court made factual findings in clear error of the record in denying Mr. Vierra's motion for a sentence below the advisory guidelines on the grounds of sentencing entrapment. We say that the answer to this question is yes, that the court's findings with respect to this issue of sentencing entrapment were incorrect, and the sentence needs to be vacated and remanded again. Just to orient me in terms of the rules we're supposed to apply, is the rule for entrapment with respect to guilt different from the rule for entrapment with respect to sentencing? Because I assume he put forward an entrapment defense at trial. That's correct. I didn't represent the defendant during the trial, but at the trial, the defense did put forward a theory of perfect entrapment. The jury did not buy that theory. However, that theory came up again during sentencing on a theory of imperfect entrapment, sentencing entrapment. At that time, the judge was Judge Gilmour. When Judge Gilmour ruled on that issue, the argument in the first appeal was that the court did not make sufficient findings of fact. The Ninth Circuit agreed and vacated the sentence, remanded the case for further proceedings. The second time around for sentencing, the case went before Judge Malway. Judge Malway heard the sentencing hearing again in October 2009. She made findings of fact. Our argument now is that... Before you get to that, though, the remand was pretty specific, wasn't it? The remand was specific. Certain directions as to what to do? Yes. Explain exactly what the district court was directed to do on remand. On remand, Justice Tshishima, the district court was instructed to make specific findings of fact with respect to the issue of sentencing entrapment. You mean on everything that's involved in sentencing entrapment? With respect... Yes. Everything involved in sentencing entrapment. With respect to certain other factors? With respect to the five factors laid out in the McClellan case. Okay, now let me stop you there. Aren't the five factors in the McClellan case really relevant to, you know, I'll call it regular entrapment, or what you call perfect entrapment? The perfect entrapment. And they really don't apply to sentencing entrapment? I agree, Your Honor. However, in the opinion... But that was still the direction of the prior panel? That was the opinion of the prior panel, yes. And so the way that... Don't you think that was a mistake? No, I do not think the court made a mistake. And the way that Judge Mulway reasoned that decision... Did she think it was a mistake? She did not say that, Justice Tshishima. She's very polite. She is polite, and she provided a rationalization. She said that the court... On all the five factors. On all the five factors, and sort of plugging that McClellan case into the sentencing entrapment theory... So then you're challenging then her findings on these five factors? On those five factors, because that is the basis of her record for saying that my client is not entitled to that theory. I'd like to jump into those. She basically said that the factors were the same, but the perspective was different. Or at least maybe that's what she said, and whether it's what she did is another question. But would you agree with that approach? I.e., you're looking at a different question. I.e., you're looking... The way that Judge Mulway phrased it at sentencing, where I did represent... The second sentencing round, where I did represent the defendant... Was she said that she was to consider predisposition a la sentencing entrapment through the lens, quote-unquote, of the McClellan case. And then she launched into her discussion of the five factors. If I could, I would like to dissect her discussion of those five factors. Now, this case was set for ten minutes. Yes. Don't be terribly concerned about the clock running down. I can see that this discussion may run more than ten. You'll talk as long as you need to talk, and same for you. I appreciate that, Justice Fletcher. With respect to these five factors, then, Justice Mulway discussed the first issue of character and reputation. And when she discussed this issue, she said that my client was selling drugs prior to 2004, and thus this sets his character and reputation for basically being a drug trafficker. And our argument is that that finding on Justice Mulway's part is just not plausible in the record. My client was not selling drugs before 2004. The record clearly shows, and it's uncontroverted, that for the ten years from 1994 to 2004, my client was using small half-gram amounts on a daily basis because he was nothing more than a drug addict. And he traded these amounts with his other friends, his fellow drug addicts, out in Wailua Town, which is just 45 minutes from here. But there's nothing in the record that shows clearly that he was ever selling. The government's two key witnesses, David Moniz and Kenneth Meyer, both support that he was never selling. David Moniz... He would take money from his friends and go to his sources and come back with the drugs, but sort of as an air boy, essentially. I don't think my client ever testified at trial. He did testify on his own behalf that he ever testified to that, that he actually took money from his pals and went and looked for drugs. The way that he described it is there's this drug addict culture going on out there, and they each help each other on a daily basis to find drugs, but nothing shows that he was actually ever involved in drug trafficking. Judge Mulway made that finding that he was selling drugs prior to 2004, and our argument is that that is not a plausible interpretation of the record. And this may be just a question of wordplay in a way. Obviously, in some sense, he was selling because as part of this exchanging, he was getting money or reimbursement for the drugs that he supplied to his buddies. They would give him drugs from time to time. But he certainly wasn't what would ordinarily be called a dealer. He was exactly, Your Honor. He was not what we would call a dealer. As to the second McClellan factor, who made the initial suggestion of the criminal activity? The record is clear, it's uncontroverted, that the government, in each of the six counts that my client was convicted of, the government initiated these drug deals. Indeed, the government initiated this entire scheme where it put this confidential informant in place out in this community, Simeon Segundo. And Segundo initiated these deals based on the money that the government gave him to complete these transactions. I don't think this issue of the use of this particular informant has been given the kind of attention that it needs, both by Judge Mulway, and I think this Court needs to pay it close attention. The record clearly shows, again and again, that the confidential informant in play by the government was simultaneously trafficking drugs of his own through all of this undercover activity. Indeed, when the confidential informant testified at the trial, he even opined from the witness stand. He said, you know, I don't know why they kept involving themselves in these deals that I set up with the government. They owed me half the time. Maybe that's why they did it. This is such a troubling aspect of this case, Your Honors, that we've got a confidential informant, and the government knows this confidential informant is simultaneously trafficking drugs, marijuana, to the targets of the investigation. Well, you know, I want us to keep an eye on the question that's in front of us, which is to say entrapment. Confidential informants are not always the nicest of people, and it may be relevant to the entrapment defense that he was dealing drugs to these very people because it would have given some leverage, but the fact that he was dealing drugs or otherwise was a disreputable character. Well, I think it's pretty important, Justice Fletcher, because... I don't quite understand why you think it's that important. I think it's important because... As to this factor, as to the factor of whether the government instituted the... It's important to the second factor as to who initiated the transactions, but it also goes to the idea of reluctance, which is the third, actually the fourth factor in McClellan, but I could talk about that now. The McClellan factors also ask the court to consider the idea of whether or not the defendant was reluctant to be involved. We think the record shows that my client, Mr. Vieira, was reluctant to be involved in these drug transactions. He certainly testified at some length, and Judge Mulway, however, found that he was not reluctant, so there was one of two possibilities. One is that she ignored the evidence, and the other is she didn't believe it. What about she didn't believe it? Well, we think she's wrong. Either she ignored it or she didn't believe it. If she ignored it, she's wrong, and the case needs to be remanded. If she didn't believe it, we still say she's wrong because she didn't look at the record that we presented to her, and... Was there countervailing evidence? I know that he testified that he was importuned several times, and he kept getting this story, well, I'm off drugs now, but my boss needs them, and if I don't get them, I'm going to be in some jeopardy for my anal, and so on. Was there countervailing evidence that the government presented that he was willing without having to be importuned in this way? No, there was no countervailing evidence because... So the question is what importance we attach to the testimony from your client on this point. I'm not sure I understand Your Honor's last question. Once you get undisputed facts, the question arises, okay, what do they mean? So your argument is, here are the facts, and we would say that that shows reluctance, and maybe Judge Molloy would say, okay, those are the facts, but I don't see that that shows reluctance within the meaning of the fact, or I guess that fits where I'm at. You know, the temptation in this case, Justice Fletcher, is to look at the record and say, my goodness, six deals. Come on already. One, two deals, maybe, but six deals? How is this sentencing entrapment? It is sentencing entrapment because my client was an addict, and the uncontroverted record shows that for 10 years prior to these government-induced deals in 2004, he was just that. He was this naive addict who only engaged in small half-gram transactions to fuel his own addiction. He was not a trafficker, and he was not a dealer. I think all that is more relevant to the sentencing entrapment defense, which was rejected by the jury. But when you get to sentencing, let me ask you a question that goes beyond the McClellan factors, and this is a flat statement in Naranjo. It says this. In making a sentencing entrapment claim, the burden is on the defendant to demonstrate both, one, the lack of intent to produce, and two, the lack of capability to produce the quantity of drugs at issue. Now, you possibly cannot meet that second requirement because he did produce the quantity of drugs at issue, right? I mean, he was convicted of that amount. So how can you meet that requirement in Naranjo? You've got to prove both. Because he did not know where to get these drugs in all of the 16. . . Naranjo doesn't require it. It says you have to prove that he lacked the capability to produce the quantity of drugs at issue. That's a requirement of the entrapment defense, according to this case. Then what are we going to do with the facts in this case, Justice Ishima, where you've got my guy, he's just . . . We're going to affirm on another basis not reached by the district court, which we can do. Well, I'd like to finish my thought because I think it's important. We've got my client. He's the addict. He is caught in the middle of this situation where the confidential informant says, Hey, I need a lot of drugs. I agree with all that. My client doesn't know where to get them. I agree with all that, but that was all rejected by the jury. With respect to perfect entrapment, now we're talking about sentencing entrapment. What does Naranjo mean by that? Because if he didn't have the ability to get it, then he wouldn't have gotten it, and he wouldn't be convicted of it, and it wouldn't be at issue with sentencing. So I don't understand what it means, but it must mean something. Both Naranjo and the Stauffer case tell us to look at predisposition prior to the government-led deals. I understand that, but it also has this phrase about inability. If the person was un- It must mean inability at the outset, not inability at the end, because if it was inability at the end, he wouldn't be convicted of having done it. But he didn't directly produce the drugs, though. I understand. I'm trying to understand Naranjo in this regard. How could not being able to do it be a requirement when if you couldn't do it, you couldn't be convicted of having done it? It must mean something else. What do you think it means? The part about the inability to do it, what do you think it means? I think it means- I think Naranjo and Stauffer together mean that we look at predisposition as to what was going on prior to the government-led deals. And when I take that and I plug in the facts of my case, what I see is that my client was not trafficking these large amounts of methamphetamine prior to the government-led deals. And sentencing and trapment occurred, and he should receive a sentencing credit for that. Why don't we hear from the government, and we'll give you a chance to respond. Thank you. Good morning. I'm Susan Cushman for the United States. May it please the Court, Ms. McMillan. Justice Berzon, I'd like to follow up with your question first about- We're all judges. It doesn't really matter, but we're judges, not justices. Sorry. There's an old joke. We are judges, and we say there's no justice on the Ninth Circuit. Well, following up on your question about Naranjo, I think what inability means is Naranjo was a reverse sting. And in that case, the defendant wasn't even capable of coming up with the amount of drugs himself, and the government actually came up with the drugs for him. And as a result of that case, there's a section in the sentencing guidelines that deals specifically with reverse stings, where the government actually provides the drugs for the defendant. So I think that's- But it can't be meant to apply to any sentencing and entrapment, because then it would never apply. That phrase can't be meant to apply to any sentencing and entrapment situation, because then it would never apply, except in that narrow circumstance. Correct. But I think that when Naranjo was written, that was how it was written, and I think it's since expanded. I mean, in this case, the bottom line is, was the district court's decision plausible in light of the record? And the answer is yes. Plausible in what? You mean in terms of McClellan? Yes. In terms of the findings she had to make? In terms of the five findings in McClellan. And, you know, on- Let me stop you here before you get to McClellan. I'm still stuck on the Naranjo point. Okay. Are you arguing that because he had the capacity, as it turned out, to deliver the quantity of drugs, game is over, no availability of the entrapment defense? Or are you saying, no, in this circumstance, we look at the five McClellan factors? I think in order to reach the answer, the ultimate answer, that there was no sentencing factor, you need to work through the five McClellan factors. I'm not worried about this phrase in Naranjo. I wouldn't, no. I think that that's the right thing to do, is to work through the five McClellan factors. So even though it turns out that he does have the capacity to deliver the drugs, that's not the end of the inquiry? That's correct. Okay. I mean, this case is essentially a case of middlemen. All these guys are middlemen. Mr. Vieira is a middleman. I mean, David Moniz described him as a middleman, and a middleman is a guy who makes the deal happen. He doesn't necessarily have to have the drugs readily accessible to him, but a middleman needs to know who to go to get the drugs from and how to put it all together and deliver the ultimate product, which is what Mr. Vieira was able to do. Well, he didn't even come up with the person. I mean, my understanding is that what happened was Segundo, first, was the government contesting the record with regard to the reluctance, i.e., that he did resist it for several weeks? I don't – there's nothing in the record to support that, that he – Yes, there is. He said so. Yes, he said so. Okay, hypothetically speaking, even if, let's say, the first – I mean, I don't dispute the fact that the government initiated this whole situation. Right, but he also says that I said no over and over again. He kept coming back to me. Okay, so even if he did – What do you mean, even if there is? Is there any evidence that that's not true? Well, if you look at the tapes, the recorded phone calls, the body wires, what the co-defendant said, you know, he never expressed reluctance. That was all later, though. That's right, but that's during the deals. He didn't – I want to keep the time frame clear as to what we're talking about. Okay. He testifies that at the beginning he is reluctant, and it is necessary over a space of some time and repeated efforts to persuade him to do that. After he begins selling, it's a different time frame. I'm interested in the first time frame. Is there any evidence to contradict what he says about his reluctance at that earlier time frame? Aside from his own statement, no. Well, his own statement supports what he said. I mean, that's what he said, right? I understand. Aside from his own statement. I understand that, but it's my position that it's a self-serving statement made by him. Well, of course it's a self-serving statement. But it's not contradicted. That's correct. I agree with that. Judge Mowat could have disbelieved him, but instead she said there's no evidence. That's not truth. It was evidence. Well, there's his statement. And then if you go on and look at the sales as they happen, there's no reluctance. It could be that he was reluctant at the outset, and then after he begins to sell, okay, now he's selling and he's no longer expressing reluctance. See, Judge Fletcher focuses on the important part of the thing. The question is, at what point is the district court supposed to make the determination of, well, was the defendant reluctant and did the government move him over to the non-reluctant side? At what point do we make that determination? Well, I think what the district court correctly found was that the government suggested or initiated this initial contact, if you will, and at some point – Now, at that point, he was reluctant. I mean, that's what the evidence shows. Except that at that point he was reluctant. Now, in your view, that's not sufficient for him to be entitled to the – No, because there were five other sales in which he was not reluctant. Not just one sale, but there were five other sales in which he was clearly not reluctant, and that's shown by what the co-defendant said about how he behaved. That's shown by the recorded conversations. It's shown by the body wire. That's a tricky question of human motivation, and it's a little unclear how we're supposed to handle that. We all know that once someone begins to do something, having been persuaded more or less against his better judgment or something, once you get going, continuing on a course of conduct that you are reluctant to initiate is a different proposition. And I'm trying to figure out how we take that sort of human reality and put it into the questions that we're asking. Does it matter that he was reluctant to get into this, and once he started, he continued doing it without showing reluctance again? Does that mean he was never reluctant? Does that mean he wasn't reluctant for the purpose of the test where he had to apply? He was – he got over his – it's my position he got over his reluctance very quickly because he was getting a benefit from the sale. He was getting, you know, methamphetamine, which he used, and to him that was as good as getting money. So his reluctance was, you know, overcome by the benefits that he was getting. Well, you know, you see, when you talk about completed sales, as we are in this case, obviously, in all those cases, at some point, the defendant's reluctance is going to be overcome. Otherwise, it wouldn't be a completed sale, right? So by definition, it's been overcome. The question is, though, at what point do you test that, and, you know, how much, let's say, insistent does there have to be by the government in order to say, well, he's entitled to the sentencing and treatment defense? I think even if you look at the first sale, though, even if you accept the defendant's statement that he was reluctant and he was pressured over this period – I don't think we have any choice but to accept it because you put in no countervailing evidence. That's correct. Okay. Okay. So it's not if, but let's just assume it's true because there's no countervailing evidence. And because Judge Mulway didn't say she didn't believe him. She could disbelieve him, but she didn't say that. She said – she just seemed to ignore the evidence. She just said there wasn't any. Well, because even with the first sale, the recordings and the conversation, the body wire, the conversation, it shows that he wasn't reluctant. I mean, he was – Now you're talking about the later period. Well, I'm talking about once the sales began. That's what I'm talking about. Okay. That's what I'm referring to as the later period. Okay. So I think that at some point, again, at some point, if you credit what Mr. Vieira said that he, you know, was pressured into doing this or he felt obligated to do this for his friend, at some point he clearly got over it because there's nothing even in the first sale. I don't want to do this again. Don't call me again. You've met my friends. You can go to them directly. There was a lot of other things that – At this point, I don't think we're quarreling over the evidence. I think we're pretty much – I asked what happened, and the only question is what's the significance, legal significance? Well, I think the legal significance is, as Judge Mulway correctly found, that the government initiated the contact with Segundo, and it began. And once it began, he was no longer reluctant. Well, assuming we're bound by this five-factor test of McClellan, where does that fit into this five-factor test? I would say probably that it addresses probably the first issue which would be – I'm sorry – which would be the character and reputation of the defendant. So I think that the reluctance would sort of go into that area, which would be the character and reputation of the defendant. There's a factor called reluctance. Okay, well, then let's go right there. I think that's number three, actually, the third McClellan one. Let me ask you something. What are the practical consequences of all this for the sentence? Why are we worrying about this exactly? What would happen if we found there was a sentencing entrapment? What would happen next? Well, because Mr. Vieira would be entitled to a reduced sentence as a result of the sentencing entrapment. I mean, given Booker, how exactly would it play out? Well, I think what would happen is – and again, I – The cases are probably pre-Booker cases, aren't they? They are. All right. So after Booker, how would it play out? Well, it's hard for me to answer that because I don't think there was any sentencing entrapment. I understand that. I want to know what we're – we have two people standing up here, one saying there was, the other was saying there wasn't. Why does it matter? Explain to me how on the ground in a practical way it's going to matter. Well, I think – I mean, if you apply – I mean, there was evidence that the amount of drugs involved was, you know, for certain sales, was over 50 grams. The jury found that. If you find that there's sentencing entrapment, do you say it wasn't 15 grams, it was a half a gram? I mean, what do you do with that point? Well, I think then you're going to have to look and answer the question, what amounts was he predisposed to sell? Is that what the case is saying? Well, I don't think that that's what they really say. I mean, I know that's what Ms. McMillan's arguing, but if you look at Naranjo and Stauffer and when they're talking about predisposition, they never specifically said that what he – those cases don't say what he was dealing at the time means that he wasn't capable of dealing larger amounts later. That's not what predisposition says. And even Judge Malway found that. So just because he used to sell 100-gram, $100 amounts of methamphetamine – Suppose the finding was he was – after the remand, suppose she had found something else. Suppose she had found that he was not predisposed to sell, you know, what is it, half ounces? Is that what he was selling? Paper amounts, yes. No, I mean later. What was he selling in the six deals that were in the conviction? Oh, well, some of them were two ounces. Some were two-ounce sales. Some were half sales. He was not predisposed to sell that. He was only – so he should only be held responsible for what he was predisposed to sell,  That's the argument. I don't agree with that. All right. So let's assume that. So then that would influence the calculation of the sentencing guidelines. But then Judge Malway presumably could then nonetheless say, but look at what he actually did and I'm going to hold him responsible for it anyway. But that's not what Stauffer nor Naranjo say. It doesn't say that just because he was selling half-gram amounts earlier in his drug career that that means that that's what he was only capable of selling later. That's not what those cases say. Let me see if I can help here. It seems to me, and you can correct me if I'm wrong on this point, that if we were to hold, which you obviously don't want us to, but if we were to hold that he was entrapped in selling these large amounts and that, therefore, for purposes of sentencing, we should assume that he was entrapped into selling things that are over half a gram, I assume that would then give us a new guideline calculation, which then the district judge would look at and under Booker would be free to ignore if she were to choose to do so. Is that right? I agree. I agree in part, but for you to do that, you would have to find that the district court was, her findings were implausible or clearly erroneous. For my purposes of the question, I'm asking you to assume that we find that. We may or may not. But I'm trying to figure out, in answer to Judge Berzon's question, why does it matter? And it matters, I think, because it changes the guideline calculation. No, that's correct. It does. It does. Yeah, but that's the question. So it's your position that under Booker, this is just another guideline calculation step, and once the guideline calculation is completed in a proper manner, the district judge under Booker can still say, well, that may be the guideline, but I'm not going to follow the guideline. Is that right? Because they're advisory. Including sentencing and credit finding is advisory. Yes. Yes. These cases don't matter because they're all just guideline cases. Well, because she could find by the preponderance of the evidence or whatever that the defendant didn't meet his burden. But given all this, given the change to Booker, does this whole structure even make sense? Or should all these considerations simply go into the 3553A factors that the judge considers, which would include things like his predisposition, his character beforehand, and so on? Well, I think in her decision she did make some findings under 3553 in addition to analyzing the five McClellan factors. I think that Judge Mollway analyzed the five McClellan factors because that was the guidance from the previous remand, was to analyze this in context of the McClellan factors. And so that's what she did. I think that's very close to a harmless error argument. But under CARDI, I mean, the district court is required to make the correct guideline calculation before she can say, I'm going to disregard it, right? They do. And there was a guideline calculation. And it's my recollection that What the appeal is on the basis that it was not correct. I'm sorry, it wasn't a I say the defendant's appeal is based upon the position that that guideline calculation was incorrect. Well, it's incorrect because of the sentencing entrapment. I mean, when she found the total offense level, Ms. McMillan, it's my recollection, did not object to that. Sentencing entrapment, we all seem to agree, is part of the guideline calculation. It is. So if she makes a mistake on the sentencing entrapment, then the entire calculation is incorrect, right? Yes. All right. Okay. Hence it matters. Yes. I mean, we wouldn't be here if it didn't matter. Okay. I guess I just want to follow up, too, with I know there was a question about whether the defendant actually sold methamphetamine for money. And if the court looks at excerpts of record, volume 2, 201, on 202, it says, question now, have there been occasions where he has sold small quantities of ice to other people for less than $100? Right. Yes. He answered yes. So that was his testimony at trial that he did, in fact, sell methamphetamine for money. And that was in the course of this sort of alcoholic exchange that he and his buddies exchanged from time to time? Right. I mean, they all did that. Yeah. I mean, this is a case, essentially, as I said, of all middlemen. These guys are all middlemen. None of them can come up with it. But what I'm asking is, or maybe what I'm saying, and then you can respond, it seems to me really quite different to be in a business where you're a drug addict, you have a circle of friends who are also drug addicts, and you trade back and forth depending on who has easier access and so on. And you then engage in small-scale monetary transactions, either to buy, to sell, to reimburse, or whatever. That's what he did before. Right. And now he's moving up instead of papers, which are apparently about a half a gram, to transactions that range between 20 grams to 60 grams. You summarize and say it's roughly 50, which seems to me about right. But he's basically moving up in transactions 100 times what he'd previously been doing. And you know what? He's not behaving like a user either. I mean, he's setting up these sales. He's negotiating. I understand that. He's giving tips. I understand that. What I'm saying is what he was doing before in selling for these amounts of up to $100 is quite different from what he did later. And you can say, well, he was selling before, and I think that's an acceptable definition or use of the word sale. Right. But my way of talking about it earlier was, it doesn't sound like he was a dealer as we would ordinarily use the word dealer, and he now turns into something that looks like a dealer. Correct. Yes. Does the Court have any further questions? Otherwise, I would ask you to affirm the sentence. Thank you. Now that you know there's no justice on the Ninth Circuit. I apologize for that, judges. The Court focuses on this notion of reluctance from the McClellan case. There was reluctance. The government's chief witness, Kenneth Meyer, said that during one of the sales, one of the two-ounce sales, my client behaved in a nervous fashion. The government's own confidential informant said that he was behaving in a nervous, paranoid fashion. That was the first sale, right? I believe that was count six, which I think was the third sale chronologically. Furthermore, we see other indices in the record that demonstrate that Mr. Vieira was just a drug addict and had stepped so far out of his league when he got involved in these government-induced drug deals. What's your response to the government's position that, well, he may have been reluctant on the first sale, but there were six sales, and the record really doesn't demonstrate the same kind of reluctance in the subsequent sales as there was to the first sale? I start to look at each of those sales, Your Honor. We've already talked about the first sale. I just mentioned the third sale, which was for approximately two ounces, in which— But being nervous doesn't mean you're reluctant. I think all dealers are nervous to an extent. I think it means he's reluctant. Two people said—one person said he was nervous, and another said he was paranoid. And in two of the other deals— What does it have to do with reluctance? I mean, people who decide to engage in crimes may nonetheless be nervous that they're going to get caught. Are you nervous right now? Yes, I am. I'm always nervous at Auburn Park. Not because you're reluctant, right? If I might, just on two more of the sales, Your Honors. We also see this strange behavior in that in one of the sales, he packaged the drugs in a blue latex glove, and in another sale, he packaged the drugs in an auto parts box. I didn't really understand what the point of that is. The point of that is— He's not a pro, so he doesn't have any— Exactly, he's not a pro. He's not a drug trafficker. If there's nothing further, Your Honor, I'll rest on that. Thank you. Thank you.
judges: Tashima, Fletcher W. , Berzon